UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| UNITED STATES OF AMERICA,    ) | |
| ) | |
| Plaintiff,    ) | |
| ) | No. 6:13-CR-50-8-GFVT-HAI |
| v.    ) | |
| ) | RECOMMENDED DISPOSITION |
| WILLIAM STEFAN NAPIER,    ) | |
| ) | |
| Defendant.    ) | |

*** *** *** ***

On referral from District Judge Van Tatenhove, the Court considers reported violations of supervised release conditions by William Stefan Napier. D.E. 386 at 2. For a court to revoke supervised release, it must find "by a preponderance of the evidence that the defendant violated a condition of supervised release." 18 U.S.C. § 3583(e)(3). The government bears that burden of proof. *United States v. Givens*, 786 F.3d 470, 473 (6th Cir. 2015) ("The government needed to prove violation of supervised-release terms only by a preponderance of the evidence.") Thus, the government must establish that it is more likely than not that a defendant violated the conditions of his supervised release before supervised release may be revoked. *United States v. Catching*, 786 F. App'x 535, 539 (6th Cir. 2019). Because the officer accusing Defendant of violating his supervised release condition made an honest, but mistaken identification, and a different individual credibly confessed in open court to committing the charged acts, the undersigned **RECOMMENDS** finding him **NOT GUILTY** of the charged violation.

**I.**

These proceedings began when an arrest warrant was sought to arrest Defendant for violating K.R.S. § 520.095 which would be a violation of Mandatory Condition # 1 of his Judgment that prohibits criminal conduct while on supervision. D.E. 383 at 3. Defendant's initial appearance

1

was first scheduled for August 3, 2023. D.E. 390. At defense counsel's request, that initial appearance was continued for one week so that she could investigate reports that another individual had confessed that he was the individual who fled from police. One week later, the initial appearance was held, and the undersigned found probable cause to detain Defendant. D.E. 393. He was alleged to have fled from law enforcement in a vehicle known as a "RZR." (Razor) At the final hearing, the parties jointly agreed to amend the supervised release violation report's charge from alleging that Defendant violated K.R.S. § 520.095 to alleging that he violated K.R.S. § 520.100. That amended charge meant that the government had to prove by a preponderance of the evidence that Defendant "knowingly or wantonly [disobeyed] a recognized direction to stop his vehicle, given by a person recognized to be a peace officer" with the intent to elude or flee while operating a motor vehicle. K.R.S. § 520.100(1)(b). Further, that conduct could not amount to only "a failure to comply with a directive of a traffic control officer." K.R.S. § 520.100(2). The dispute at the final hearing was not whether the offense was committed, but rather whether Defendant had committed it.

    Three potential witnesses were sequestered for the final hearing. Rec. at 7:04-7:39. Of those three potential witnesses, two testified.[1] First, Deputy Shane Wilson of Leslie County Sheriff's Office testified for the government. Rec. at 8:51-9:02. Second, Micheal Dean Dotson, who looked similar to Defendant, testified for the defense. Rec. at 26:50-26:56, 46:11-46:25, 44:35-44:57. Both the Court and Dotson's appointed counsel told him that he did not have to testify and could invoke the privilege against self-incrimination. Rec. at 8:24-8:37, 28:20-28:37. During his testimony, Dotson admitted to driving the side-by-side RZR on July 27, 2023, to

---

[1] No dash cam or body cam recorded the incident. Rec at 20:16-20:49.

2

running right through the stop-sign at Tim Couch Pass, and to fleeing from Officer Wilson. Rec. at 33:34-33:45, 34:34-34:39.

Wilson testified that, during the evening (around five or six o'clock) of July 27, 2023, he encountered Defendant, whom he had previously met, at Highway 118, which he confirmed was commonly referred to as Tim Couch Pass, and Highway 421's intersection. Rec. at 10:40-11:44, 14:10-14:34. Wilson testified that he saw Defendant run the stop sign in a RZR.[2] (an enclosed side-by-side) as the Deputy was driving past a BP station located there at that time. Rec. at 15:00-15:14, 18:39-18:47. Dotson, however, explained that, on July 27, he was driving Lisa Marcum's recently purchased (from Defendant's mother) side-by-side. Rec. at 32:21-32:51. Marcum is a friend of Dotson's father. Rec. at 33:00-33:09. Dotson explained that he was driving the side-by-side for Marcum to check out the clutch that she recently placed on it. Rec. at 32:52-33:00. He explained that since the side-by-side seemed to be fine, he drove it out to the BP station in Hyden. Rec. at 33:15-33:29. As he was pulling out of the BP, Dotson explained that he saw a cop car driving down the road. Rec. at 33:30-33:45. Because the cop car made him feel nervous, Dotson ran a stop sign at the intersection of Highway 421 and Tim Couch Pass.[3] Rec. at 33:29-33:44. Dotson explained that this occurred in the evening, but while it was still light outside. Rec. at 42:00-42:35.

Once Wilson was near NAPA, which was less than a quarter mile from the intersection, he activated his emergency lights and sirens. Rec. at 11:45-11:52, 15:45-16:38. Wilson explained

---

[2] As was established at the final hearing, RZR's have car doors, a roof, and metal bars holding up that roof. Rec. at 18:47-19:27. They also have seats and headrests like those in automobiles. Rec. at 19:25-19:43. (Despite that, Wilson maintained that he positively identified Defendant as the RZR's driver.) Rec. at 19:42-19:52.

[3] Although Dotson initially expressed some doubt during the government's cross-examination about whether there was (1) a stop light, (2) a stop sign or (3) caution lights at the intersection, he eventually confirmed that he believed the intersection had a stop sign. Rec. at 38:01-38:34. Similarly, Dotson was uncertain what make and model the police car was, although he correctly identified the car as belonging to the County Sheriff's Department. Rec. at 38:43-39:06.

that, despite activating his lights and sirens, the driver failed to stop, continued on Highway 421, and briefly glanced back at him. Rec. at 11:48-12:02. The driver's glance back, which occurred on a stretch of highway between NAPA and Wolfe and Sons, enabled Wilson to identify Defendant as the driver. Rec. at 11:48-12:02, 16:55-17:07. Wilson admitted that both vehicles were driving about fifty miles per hour and he was about fifty feet behind the side-by-side at that time. Rec. at 17:24-17:55. Soon afterward, Wilson explained, the driver turned onto Jason Branch Road and then onto a side-by-side trail. Rec. at 12:01-12:12. After the driver turned onto the trail, Wilson lost him. Rec. at 12:06-12:12. Wilson explained that the pursuit ended because he could not get his cruiser onto the side-by-side trail that the driver had turned onto. Rec. at 13:25-13:30. Dotson testified that he fled from police after running the stop sign, going through Jason Branch Road to get to a trail that reached the holler where he resides. Rec. at 33:39-35:03. Dotson explained that he used the trail to get back home. Rec. at 34:54-35:03. According to Dotson, he looked back at the officer only once during the chase. Rec. at 35:13-35:21.

  Wilson testified that Defendant's mother lived on Jason Branch Road. Rec. at 13:32-13:45. But Wilson admitted that Defendant was not at his mother's house when he was there on July 27, 2023. Rec. at 26:08-26:20. Wilson explained that he knew both Dotson and Napier, asserting that he would have recognized Dotson if he was fleeing on that day. Rec. at 13:50-14:04, 12:40-12:55. But Wilson did not know that Dotson's family house was accessible from Jason Branch Road. Rec. at 21:10-21:30.

  Dotson said he later learned from his father that police were looking for Defendant, believing that Defendant fled from Wilson after having run a stop sign. Rec. at 35:39-36:05. Knowing that Defendant could go to prison for that act, Dotson decided to come forward and admit guilt. Rec. at 36:06-36:25. He explained that no one had improperly persuaded him to come

4

forward and admit guilt, including Defendant himself. Rec. at 35:20-35:40. Instead, Dotson said he could not morally let someone else be imprisoned for a crime that he committed. Rec. at 36:48-37:00.

So, Dotson said he had Marcum take him to the Sheriff's station. Rec. at 36:27-36:35. There, Dotson confessed to the Sheriff that he was the individual who ran the stop sign and fled from Wilson on July 27, 2023. Rec. at 36:35-36:40. Instead of taking Dotson seriously, the Sheriff was uninterested in Dotson's confession, declining to ask him many questions. Rec. at 36:40-36:48. Wilson claimed that the Sheriff told him that Dotson could not tell the Sheriff where he ran to or what the reason for the stop was. Rec. at 24:32-25:03. But he also admitted to not knowing if the Sheriff took a written or recorded statement from Dotson when Dotson visited the Sheriff. Rec. at 25:33-25:47.

## II.

The undersigned finds Micheal Dean Dotson's testimony to be very credible. Dotson exposed himself to state based criminal liability by testifying. He admitted to violating K.R.S. § 520.100, for which he could spend up to one year imprisoned. He did so against counsel's advice to invoke the Fifth Amendment's privilege against self-incrimination and the Court's admonition that he did not have to testify. Dotson stated his reason for doing so is that he does not want someone else to be wrongly punished for his crime. The Court has no reason to disbelieve that stated reason as no evidence has been presented suggesting that Defendant or anyone else has wrongfully attempted to get Dotson to claim responsibility for fleeing from Wilson on July 27, 2023. Nor is there any other significant reason to believe that Dotson is biased or has any other reason to testify dishonestly.

Dotson's past attempt to confess to the Sheriff strongly supports Dotson's testimony because it establishes that his admissions have been made consistently over time. Consistent statements over time are typically indicative of truthfulness. Although Wilson claims that the Sheriff told him that Dotson didn't know the exact details of the crime when he tried to confess, that is hearsay. Dotson explained that the Sheriff did not seem to be concerned about his attempted confession, having declined to question him about it. Further, the Deputy Sheriff testified that he did not know whether the Sheriff had taken a written or recorded statement from Dotson at the time, which suggests that the Deputy Sheriff was not told the details of what transpired during the attempted confession.

Additionally, despite separation, Dotson's version of events is largely consistent with Wilson's retelling. Like Wilson, Dotson asserts that the incident occurred in the evening. Like Wilson, Dotson asserts that he looked back only once. Like Wilson, Dotson asserts that he drove down Jason Branch Road onto a trail. Dotson explained that he drove down Jason Branch Road to get to that trail because he could get to his house by taking it. Both Wilson and Dotson testified that a BP station was near the intersection where Dotson failed to lawfully stop. While Dotson was initially uncertain whether that intersection had a stop sign, a stop light, or just caution lights, he ultimately correctly asserted that the intersection had a stop sign. Similarly, Dotson's inability to identify the exact make and model of the police car does not cast doubt on his testimony as Dotson admitted to being uncertain and explained that he only saw it briefly. Those minor inconsistencies are to be expected among lay witnesses and honest admissions of uncertainty can give more credibility to a witness's other testimony because it indicates the witness's willingness to be forthright with the Court. Further, Dotson correctly identified the intersection as being the one located at Highway 421 and Tim Couch Pass.

In addition to Dotson's credibly made statement against interest, the brief moment that Wilson had to observe the driver's face could easily lead to an honestly made misidentification. Wilson observed the driver from fifty feet away while driving at approximately fifty miles per hour. Wilson necessarily only saw the driver's face for a few seconds through the enclosed side-by-side that illegally drove through the intersection. The Court has no doubt that Wilson honestly believes he saw Defendant driving the side-by-side on the day in question. But, as the Court observed during the hearing, Dotson and Defendant have very similar faces. The Deputy could easily have mistaken one for the other when he saw the driver at a distance for only a brief moment with obstructions such as the side-by-side's car-like seats and metal bars in between him and the side-by-side's driver.

The undersigned credits the sworn confession of Dotson. Combined with the ease with which Wilson could have thought that Dotson was Defendant, that credibility determination leads the Court to conclude that the government failed to meet its burden of proof as the evidence presented during the final hearing does not establish that it is more likely than not that Defendant fled from police on July 27, 2023.

### III.

Therefore, the Court **RECOMMENDS** that William Stefan Napier be found **NOT GUILTY** of the charged violation because the United States has failed to prove by a preponderance of the evidence that he violated K.R.S. § 520.100. Notably, the Court released Defendant on his current conditions following the final hearing.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of the statute. *See also* 18 U.S.C. § 3401(i). As defined by § 636(b)(1), within **fourteen** days after being served with a copy of this recommended

decision, any party may serve and file written objections to any or all portions for consideration, de novo, by the District Court. Failure to make a timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981).

This the 1st day of September, 2023.

Signed By:
*Hanly A. Ingram*
United States Magistrate Judge